UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x

RICHARD SAYAGE                        :   Filed via ECF
                                          :
                    Plaintiff,    :   Civil Action No. 05-Civ. 1036
                                          :
                                          :   **COMPLAINT**
      - against -                     :
                                          :
                                          :   **PLAINTIFF DEMANDS**
BASELINE FINANCIAL, a division of     :   **A TRIAL BY JURY**
THE THOMSON CORPORATION,         :
                                          :
                                          :
                    Defendant.   :

----------------------------------------------------x

## I. INTRODUCTORY STATEMENT

1.   Plaintiff Richard Sayage, a male American citizen of Arab/Palestinian heritage and national origin, seeks redress for discrimination and retaliation suffered by him in violation of the Constitution and laws of the United States in his capacity as an employee of defendant Baseline Financial, a division of The Thomson Corporation.

## II. JURISDICTION AND VENUE

2.   This action is brought and jurisdiction lies pursuant to 28 U.S.C. §§1331 and 1343, this being a suit based upon the provisions of Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991, as amended ("Title VII"), 42 U.S.C. §§2000e-2 *et seq*. In addition, pursuant to 28 U.S.C. §1367(a), plaintiff invokes the Court's supplemental jurisdiction as to pendent New York State claims arising under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law, Article 15, §290 *et seq*., and pendent New York City claims arising under the New York City Human Rights Law ("NYCHRL"), Title 8 of the Administrative Code of the City of New York, §§8-101 *et seq*.

3.    Venue is proper in this district because plaintiff's claim for relief arose here, and defendant is doing business here.

### III.  PARTIES

4.    Plaintiff Richard Sayage ("Plaintiff") is a male American citizen of Arab/Palestinian heritage and national origin, residing at 93 South Penataquit Avenue, Bayshore, New York 11706.

5.    Upon information and belief, at all times material herein, defendant Baseline Financial, a division of The Thomson Corporation ("Defendant"), is either a domestic corporation or a foreign corporation having substantial contacts with the State of New York, with offices at 395 Hudson Street, New York, New York 10014, and the headquarters and principal place of business of The Thomson Corporation at Metro Center, One Station Place, Stamford, Connecticut 06902, that is engaged in the business of providing financial-related information and technology applications to the financial services industry.

### IV.  FACTS

6.    Plaintiff is of Arab/Palestinian heritage and national origin.

7.    In or about 1994, plaintiff was hired by defendant to manage its Nightly Process, which entailed amassing on a nightly basis the information generated by defendant's data services and client services departments, and in turn packaging it for delivery to defendant's clients for their use.

8.    At the time of his hire by defendant, defendant was unaware of plaintiff's Arab/Palestinian heritage and national origin, but subsequently, within the first few years of plaintiff's employment therewith, via conversations with plaintiff, defendant did become aware

2

of plaintiff's background in this regard.

9.      During his first five years of employment with defendant, plaintiff developed and improved upon a variety of computer systems utilized by defendant to manage its data, so that the management of such data became more streamlined and efficient and better geared to handle the ever-increasing amounts of data with which defendant dealt.

10.     After approximately five years in defendant's employ, plaintiff trained his successor as head of the Nightly Process and thereafter transitioned into the area of software systems creation, or document writing, and in that role wrote computer systems and software specifications to aid the Research Analysts and Senior Research Analysts in defendant's Data Integrity Department in the performance of their jobs.

11.     In or about mid- to late-2000, plaintiff assumed the responsibilities of a project manager in charge of all aspects of software for a large and complex project, that of defendant's Standard & Poor's 1500 Classification Program.

12.     Through this point in time, and in fact over the entire course of his employment with defendant, plaintiff always performed his duties in better-than-satisfactory fashion, with care and success, and compiled a performance record, as evidenced by favorable performance reviews, salary increases and bonuses, reflective of same.

13.     Despite his skills and performance, defendant's recognition of same, and his involvement in a number of areas of defendant's business, plaintiff never, during the course of his employment with defendant, received a formal job title, nor the attendant compensation and benefits, reflective of and commensurate with his duties, responsibilities and accomplishments with the company.

3

14.     At the time of the terrorist attacks of September 11, 2001, defendant's offices were located in the World Trade Center, and as a consequence were destroyed as a result of the attacks.

15.     Shortly after the September 11th terrorist attacks, Simon Chen ("Chen"), defendant's Executive Vice President, approached plaintiff and asked him how he and his parents and his family in general felt about the attacks.

16.     When plaintiff responded that he did not understand why Chen was asking him such a question, Chen indicated that his interest lay in the fact that plaintiff and his family were Arabs. As plaintiff believed, and in response told Chen that he believed, this question to be a means of insinuating that he and his parents, by virtue of their sharing the same heritage with the perpetrators of the attacks, had some sympathy with their cause and/or agreement with their methods, he became upset, and visibly so, with Chen for having asked it.

17.     Undeterred, Chen continued to probe plaintiff as to how he and his family, as Arabs, and specifically Arabs of Palestinian descent, felt about what the terrorists had done, which, predictably, served only to exacerbate plaintiff's upset at the interrogation, to the point that he felt compelled to defend himself and his family by informing Chen that he and his family, like all Americans, were devastated by the attacks, and felt sorrow and concern for their victims, and that his parents had in particular feared for his safety and life, as they had been in Europe at the time of the attacks, and thus had been unaware as to whether plaintiff had been in defendant's World Trade Center offices at the moment of their occurrence.

18.     Chen, however, unswayed by this, continued to ask plaintiff how he and his family felt about the attacks in light of their being Arabs like the terrorists. Plaintiff angrily

4

advised Chen that his parents had been American citizens since the 1960s, and that he himself had been born in Coney Island Hospital in Brooklyn, New York. Plaintiff added that he was proud of his Arab and Palestinian heritage, and that it had been the very violence that the attacks exemplified that had compelled his family to flee their homeland for the United States, before finally pointedly asking Chen, "What the hell do fanatical Muslims have to do with me?" Only at this point did Chen drop the subject and conclude the conversation.

19.    Following this conversation, plaintiff was so uncomfortable, angry and offended that he could no longer work and abruptly left for the day.

20.    Subsequent to Chen's discriminatory remarks to him, plaintiff was contacted by the Federal Bureau of Investigation ("FBI"), which called upon plaintiff to account for his whereabouts on September 11, 2001 in response to information provided to the FBI by an unidentified employee of defendant that plaintiff had been absent from defendant's offices on the day of the terrorist attacks.

21.    Plaintiff's work schedule at the time of the attacks, well-known to those at defendant, did not require him to report to work at defendant's offices each day until 2 p.m., or in other words until many hours after the time at which the attacks occurred, so that the referral of plaintiff's name to the FBI by the unidentified source at defendant, without any credible evidence justifying such, was unquestionably done on the basis of plaintiff's Arab heritage and national origin, and the commonality of that heritage and national origin between plaintiff and the perpetrators of the attacks.

22.    Plaintiff was specifically advised by the FBI agent conducting the investigation of him that the information that led the FBI to commence such investigation had originated

with defendant, but when plaintiff requested that the agent reveal to him the identity of the source(s) of the information, the agent advised him that he was not permitted to do so.

23.     After plaintiff's discussion with the FBI agent conducting the investigation of him, in which plaintiff explained that his work schedule was such that he was not required to report to defendant's offices, on September 11, 2001 or any other day, until 2 p.m., plaintiff was advised by the agent that the investigation of him would be closed, and thereafter, plaintiff was not contacted again by the FBI.

24.     Plaintiff advised defendant of his investigation by the FBI in connection with the September 11th terrorist attacks, and that the information that had prompted such investigation had come from defendant. However, to plaintiff's knowledge, defendant took no meaningful action to determine the identity of the individual(s) responsible for the blatantly discriminatory referral of his name to the FBI, much less to reprimand or discipline that individual or those individuals therefor. In fact, far from providing plaintiff any redress in connection with this matter, defendant, in proceedings before the Equal Employment Opportunity Commission ("EEOC"), suggested that plaintiff had fabricated both that he had been investigated by the FBI and that such investigation had been prompted by the actions of individual(s) employed by defendant; this, despite documentary evidence squarely to the contrary.

25.     Despite the foregoing, in the aftermath of the September 11th attacks, and the resultant destruction and loss of all of defendant's databases and the majority of its software systems, including the critical Standard & Poor's 1500 Classification software, plaintiff spearheaded the immense and daunting effort to re-create such databases and systems, doing so even though responsibility for such a task naturally rested with defendant's development

6

department.

26.    Plaintiff's work in leading the effort to reconstruct defendant's utterly devastated data creation and management capacity, the very essence of defendant's business, if not existence, occurred over a substantial period of time, comprised of long days and nights, and in taking place primarily in Philadelphia, caused plaintiff to be away from his family in Long Island for extended spans of time.

27.    Not long after Chen's discriminatory remarks to plaintiff in connection with the September 11th attacks, in or about early January 2002, plaintiff's direct supervisor at the time, Alfredo Guzman ("Guzman"), at Chen's direction, advised plaintiff that his compensation would be reduced and his hours changed to a less favorable arrangement, and that if plaintiff complained about these actions, "there was going to be trouble for" him.

28.    Then, also in the first quarter of 2002, plaintiff's project manager and document writing responsibilities were abruptly and without explanation taken from him. When plaintiff inquired of defendant as to the reason for this action, he was ignored.

29.    Thereafter, plaintiff's responsibilities shifted to writing software for defendant's back-end users, a job very similar to that performed by developers, yet a position for which he possessed no formal qualifications.

30.    Nevertheless, plaintiff performed this role, and performed it well, so that he rapidly became adept, even expert, at the developer-related tasks and responsibilities of the role, and over time came to perform, and perform well, the full responsibilities of a developer.

31.    Despite plaintiff's assumption and performance of developer responsibilities, he was denied the formal title of developer, official membership on defendant's development team

7

and the compensation and other benefits, such as a flexible work schedule, accorded other developers.

32.    After enduring these slights and inequities for some time, and upon coming to appreciate their relation to the discriminatory animus evidenced by the anti-Arab/Palestinian sentiments expressed to him by Chen in the wake of the September 11th tragedy, on or about September 16, 2002, plaintiff registered with defendant a complaint regarding same that attributed these and other adverse actions to discrimination against him on account of his Arab/Palestinian heritage and national origin, and that in that connection referenced Chen's derogatory post-September 11th remarks regarding plaintiff's Arab/Palestinian heritage and national origin.

33.    The day following plaintiff's complaint of national origin discrimination, and in manifest retaliation for that complaint and the legally protected activity it embodied, defendant, led by Chen, demanded that plaintiff resign, and even went so far as to force plaintiff from its premises while he weighed such demand and the concomitant offer of severance pay, which offer was contingent upon the execution of a release that would have operated as a waiver of plaintiff's discrimination claims, and which offer defendant was so eager for plaintiff to accept that, when he instantly balked at it, defendant doubled, then tripled it on the spot – and all of this against the backdrop of defendant not ordinarily being in the habit of offering departing employees severance pay at all. At that same time, defendant also proffered to plaintiff what it purported to be a response to his complaint, which response was barebones and failed to address at all, much less in any meaningful substance, most of the elements of plaintiff's complaint, including his charges of national origin discrimination.

34.     When defendant's order that plaintiff vacate its premises to contemplate its call for his resignation was reiterated to him by Guzman, plaintiff, shocked by these events, asked Guzman what he was supposed to do with himself, to which Guzman replied, "Whatever the hell you want, just don't do it here."

35.     After having been effectively thrown out of defendant's offices, plaintiff sought legal advice, in regard to the events of that day and the larger issues of discrimination and retaliation then facing him, and after doing so, resolved not to be bullied from his job, and hence not to resign, as defendant desired.

36.     Upon returning to defendant's office the following day, and commencing to perform his job duties and responsibilities as usual, plaintiff was approached by an incredulous and hostile Guzman, who asked plaintiff what he was doing there, to which plaintiff answered, "Working. I'm still employed here, right?"

37.     Upon meeting later that day with Guzman to formally advise him that he would not accede to defendant's demand that he resign, as well as to furnish him with written responses to defendant's answer to his complaint and its offer of severance pay, Guzman inquired of plaintiff as to why he would want to continue working in such a hostile and uncomfortable environment.

38.     Thereafter, plaintiff continued to press his complaints, including those of national origin discrimination and retaliation, with defendant, to no avail.

39.     Far from remedying the discriminatory and retaliatory conditions about which he complained, in response to plaintiff's grievances, defendant took further punitive, discriminatory and retaliatory action against him, advising him that his formal title and position

9

was that of Senior Research Analyst, a near-entry-level position – in fact, the second-lowest position in the company's hierarchy – staffed by individuals with no more than a year or two's tenure with the company, as opposed to plaintiff's eight-plus years at the time, which position's duties and responsibilities did not at all reflect the type of work plaintiff was, and had been for a substantial period of time, performing. In short, in continued discrimination against him and in patent retaliation for his ongoing pursuit of complaints of discrimination, plaintiff was demoted.

40.     Not surprisingly, in the position of Senior Research Analyst, plaintiff reported to an individual who had been working not only at defendant, but generally, for but a few years.

41.     Even with such demotion, plaintiff continued, with defendant's full knowledge and sanction, to perform as the great majority of his workload the much-higher-level developer work that he had been performing, and whose benefits defendant had been reaping, for an extended period of time.  As in the past, plaintiff was neither compensated nor awarded benefits in a manner and at a level commensurate with this work.

42.     In addition to his demotion, as he continued to press with defendant his complaints of illegal treatment, plaintiff was subjected to other reprisals, including, but not limited to:

(i)     discipline for personal time not in fact taken;

(ii)     extended periods of time without the receipt of assignments from, and isolated by, his superiors;

(iii)     overbearingly intense scrutiny, in the form of threats, unwarranted criticism and hostility;

10

(iv)   exclusion from meetings and other interactive processes with respect to work he had performed, when protocol and common sense dictated his participation therein;

(v)   continued denial of the accommodation bestowed upon other developers, by which they were granted the opportunity to work one day from home, which accommodation was of particular value to him, given health issues with his daughter;

(vi)   perfunctory salary reviews resulting in minor, if not outright token, pay increases; and

(vii)   having been charged a half-day's vacation for attempting for three and a half hours to reach work during a blizzard in February 2003, when many of defendant's employees opted simply, and without penalty, to stay home.

43.   In a particularly egregious act, after delays in train service caused plaintiff to arrive late for work, defendant undertook to contact the Long Island Railroad to verify plaintiff's report of delay, lengths to which defendant had not previously gone in connection with other late-arriving employees.

44.   During this longstanding campaign of discrimination and reprisal, plaintiff continued to complain about such illegal treatment, both directly to defendant and, on or about December 6, 2002, in the form of a charge of discrimination, to the EEOC, and to specifically link such treatment in those complaints to his national origin and to retaliation for his various legally protected activities.

45.   After plaintiff filed his charge of discrimination against defendant with the EEOC, defendant's mistreatment of him became particularly intense, extending to subjecting him to repeated instances of unwarranted reprimands, ridicule, cursing, yelling and table-

11

pounding, all in full view of his coworkers.

46.     In or about late 2003, Baseline Financial was integrated into The Thomson Corporation, and as a consequence of such integration, defendant instituted a layoff, pursuant to which plaintiff was, on or about November 12, 2003, terminated, by Guzman and with the express approval of Chen.

47.     Though the stated purpose of the layoff was to reduce staff in all of defendant's departments, defendant's development team was not only not diminished in size, but was in fact expanded to include two new members, one of whom had been specifically trained by plaintiff in development work, and both of whom, as employees engaged until then in areas of the company not devoted to development work, possessed considerably less development experience, both in general and in particular in the type of back-end development work that was the primary focus of the development team, than plaintiff.

48.     Shortly after his discharge, plaintiff amended his charge of discrimination before the EEOC to encompass his termination and the circumstances surrounding it, and after conducting an investigation into plaintiff's allegations across both charges, the EEOC, on or about November 29, 2004, issued a Determination finding probable cause that defendant had, by its actions against plaintiff, violated Title VII.

49.     Thereafter, on or about December 15, 2004, following the failure of its conciliation process, the EEOC issued to plaintiff a Notice of Right to Sue. Plaintiff then commenced the within action.

50.     Plaintiff has been denied equal terms, conditions and privileges of employment on the basis of national origin discrimination and retaliation.

12

51.     The acts of defendant in discharging plaintiff in violation of Title VII of the Civil

Rights Act of 1964 and the Civil Rights Act of 1991, as amended, as well as the NYSHRL and

the NYCHRL, have caused plaintiff to be permanently and irreparably harmed and damaged,

and cost him wages, bonuses, savings benefits, insurance coverage, pension benefits, among

other losses, as a result of the illegal discrimination and retaliation.

## V.  FIRST CLAIM FOR RELIEF

52.     Plaintiff herewith realleges and incorporates by reference paragraphs "1"

through "51" of this Complaint.

53.     As a result of the willful discriminatory actions of defendant, plaintiff has been

unlawfully deprived of employment opportunities and his civil rights in violation of Title VII of

the Civil Rights Act of 1964 and the Civil Rights Act of 1991, as amended.

## VI.  SECOND CLAIM FOR RELIEF

54.     Plaintiff herewith realleges and incorporates by reference paragraphs "1"

through "53" of this Complaint.

55.     As a result of the willful retaliatory actions of defendant, plaintiff has been

unlawfully deprived of employment opportunities and his civil rights in violation of Title VII of

the Civil Rights Act of 1964 and the Civil Rights Act of 1991, as amended.

## VII.  THIRD CLAIM FOR RELIEF

56.     Plaintiff herewith realleges and incorporates by reference paragraphs "1"

through "55" of this Complaint.

57.     As a result of the willful discriminatory actions of defendant, plaintiff has been

unlawfully deprived of employment opportunities and his civil rights in violation of the New

York State Human Rights Law.

## VIII.  FOURTH CLAIM FOR RELIEF

58.     Plaintiff herewith realleges and incorporates by reference paragraphs "1" through "57" of this Complaint.

59.     As a result of the willful retaliatory actions of defendant, plaintiff has been unlawfully deprived of employment opportunities and his civil rights in violation of the New York State Human Rights Law.

## IX.   FIFTH CLAIM FOR RELIEF

60.     Plaintiff herewith realleges and incorporates by reference paragraphs "1" through "59" of this Complaint.

61.     As a result of the willful discriminatory actions of defendant, plaintiff has been unlawfully deprived of employment opportunities and his civil rights in violation of the New York City Human Rights Law.

## X.  SIXTH CLAIM FOR RELIEF

62.     Plaintiff herewith realleges and incorporates by reference paragraphs "1" through "61" of this Complaint.

63.     As a result of the willful retaliatory actions of defendant, plaintiff has been unlawfully deprived of employment opportunities and his civil rights in violation of the New York City Human Rights Law.

## XI.  PRAYER FOR RELIEF

WHEREFORE, plaintiff prays:

A.  Pursuant to the FIRST CLAIM FOR RELIEF against defendant:

1.  That the Court find and declare that plaintiff has suffered from acts of discrimination at the hands of defendant, its agents, servants and employees;

2.  That plaintiff be awarded the pay, together with related monetary benefits, including bonuses, and the value of other related benefits, that he was due, but that were wrongfully withheld from him, for performing work, duties and responsibilities for which he was not commensurately compensated.

3.  That plaintiff be awarded the back pay, calculated at a level commensurate with the work, duties and responsibilities he performed, together with related monetary benefits, including bonuses, and the value of other related benefits, that he would have earned and been entitled to had he not been discharged, as well as other compensatory damages resulting from defendant's intentional, willful and malicious conduct, including, but not limited to, damages for future pecuniary loss, emotional pain, suffering, distress, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses;

4.  That plaintiff be awarded punitive damages for defendant's intentional and willful conduct engaged in with malice and/or reckless indifference to plaintiff's federally protected rights;

5.  That the Court order such further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of discrimination complained of herein, including reinstatement and/or front pay, calculated at a level commensurate with the work, duties and responsibilities plaintiff performed; and

6.  That defendant pay plaintiff's costs of this suit, together with his attorneys' fees and prejudgment interest.

15

B.   Pursuant to the SECOND CLAIM FOR RELIEF against defendant:

7.    That the Court find and declare that plaintiff has suffered from acts of retaliation at the hands of defendant, its agents, servants and employees;

8.    That plaintiff be awarded the pay, together with related monetary benefits, including bonuses, and the value of other related benefits, that he was due, but that were wrongfully withheld from him, for performing work, duties and responsibilities for which he was not commensurately compensated.

9.    That plaintiff be awarded the back pay, calculated at a level commensurate with the work, duties and responsibilities he performed, together with related monetary benefits, including bonuses, and the value of other related benefits, that he would have earned and been entitled to had he not been discharged, as well as other compensatory damages resulting from defendant's intentional, willful and malicious conduct, including, but not limited to, damages for future pecuniary loss, emotional pain, suffering, distress, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses;

10.    The plaintiff be awarded punitive damages for defendant's intentional and willful conduct engaged in with malice and/or reckless indifference to plaintiff's federally protected rights;

11.    That the Court order such further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of retaliation complained of herein, including reinstatement and/or front pay, calculated at a level commensurate with the work, duties and responsibilities plaintiff performed; and

12.    That defendant pay plaintiff's costs of this suit, together with his attorneys' fees

16

and prejudgment interest.

      C.     Pursuant to the THIRD CLAIM FOR RELIEF against defendant:

      13.    That the Court find and declare that plaintiff has suffered from acts of discrimination at the hands of defendant, its agents, servants and employees;

      14.    That plaintiff be awarded the pay, together with related monetary benefits, including bonuses, and the value of other related benefits, that he was due, but that were wrongfully withheld from him, for performing work, duties and responsibilities for which he was not commensurately compensated.

      15.    That plaintiff be awarded the back pay, calculated at a level commensurate with the work, duties and responsibilities he performed, together with related monetary benefits, including bonuses, and the value of other related benefits, that he would have earned and been entitled to had he not been discharged, as well as other compensatory damages resulting from defendant's intentional, willful and malicious conduct, including, but not limited to, damages for future pecuniary loss, emotional pain, suffering, distress, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses;

      16.    That the Court order such further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of discrimination complained of herein, including front pay, calculated at a level commensurate with the work, duties and responsibilities plaintiff performed;

      17.    That defendant pay plaintiff Five Hundred Thousand Dollars ($500,000) as and for general damages for pain and suffering and emotional distress, incurred as a result of defendant's conduct; and

18.     That defendant pay plaintiff's costs of this suit, together with his attorneys' fees and prejudgment interest.

D.     Pursuant to the FOURTH CLAIM FOR RELIEF against defendant:

19.     That the Court find and declare that plaintiff has suffered from acts of retaliation at the hands of defendant, its agents, servants and employees;

20.     That plaintiff be awarded the pay, together with related monetary benefits, including bonuses, and the value of other related benefits, that he was due, but that were wrongfully withheld from him, for performing work, duties and responsibilities for which he was not commensurately compensated.

21.     That plaintiff be awarded the back pay, calculated at a level commensurate with the work, duties and responsibilities he performed, together with related monetary benefits, including bonuses, and the value of other related benefits, that he would have earned and been entitled to had he not been discharged, as well as other compensatory damages resulting from defendant's intentional, willful and malicious conduct, including, but not limited to, damages for future pecuniary loss, emotional pain, suffering, distress, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses;

22.     That the Court order such further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of retaliation complained of herein, including front pay, calculated at a level commensurate with the work, duties and responsibilities plaintiff performed;

23.     That defendant pay plaintiff Five Hundred Thousand Dollars ($500,000) as and for general damages for pain and suffering and emotional distress, incurred as a result of

defendant's conduct; and

24.     That defendant pay plaintiff's costs of this suit, together with his attorneys' fees and prejudgment interest.

E.   Pursuant to the FIFTH CLAIM FOR RELIEF against defendant:

25.     That the Court find and declare that plaintiff has suffered from acts of discrimination at the hands of defendant, its agents, servants and employees;

26.     That plaintiff be awarded the pay, together with related monetary benefits, including bonuses, and the value of other related benefits, that he was due, but that were wrongfully withheld from him, for performing work, duties and responsibilities for which he was not commensurately compensated.

27.     That plaintiff be awarded the back pay, calculated at a level commensurate with the work, duties and responsibilities he performed, together with related monetary benefits, including bonuses, and the value of other related benefits, that he would have earned and been entitled to had he not been discharged, as well as other compensatory damages resulting from defendant's intentional, willful and malicious conduct, including, but not limited to, damages for future pecuniary loss, emotional pain, suffering, distress, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses;

28.     That plaintiff be awarded punitive damages for defendant's intentional and willful conduct engaged in with malice and/or reckless indifference to plaintiff's city-protected rights;

29.     That the Court order such further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of discrimination complained of herein, including reinstatement and/or front pay, calculated at a level commensurate with the work,

19

duties and responsibilities plaintiff performed;

30.     That defendant pay plaintiff Five Hundred Thousand Dollars ($500,000) as and for general damages for pain and suffering and emotional distress, incurred as a result of defendant's conduct; and

31.     That defendant pay plaintiff's costs of this suit, together with his attorneys' fees and prejudgment interest.

F.   Pursuant to the SIXTH CLAIM FOR RELIEF against defendant:

32.     That the Court find and declare that plaintiff has suffered from acts of retaliation at the hands of defendant, its agents, servants and employees;

33.     That plaintiff be awarded the pay, together with related monetary benefits, including bonuses, and the value of other related benefits, that he was due, but that were wrongfully withheld from him, for performing work, duties and responsibilities for which he was not commensurately compensated.

34.     That plaintiff be awarded the back pay, calculated at a level commensurate with the work, duties and responsibilities he performed, together with related monetary benefits, including bonuses, and the value of other related benefits, that he would have earned and been entitled to had he not been discharged, as well as other compensatory damages resulting from defendant's intentional, willful and malicious conduct, including, but not limited to, damages for future pecuniary loss, emotional pain, suffering, distress, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses;

35.     The plaintiff be awarded punitive damages for defendant's intentional and willful conduct engaged in with malice and/or reckless indifference to plaintiff's city-protected rights;

20

36.     That the Court order such further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of retaliation complained of herein, including reinstatement and/or front pay, calculated at a level commensurate with the work, duties and responsibilities plaintiff performed;

37.     That defendant pay plaintiff Five Hundred Thousand Dollars ($500,000) as and for general damages for pain and suffering and emotional distress, incurred as a result of defendant's conduct; and

38.     That defendant pay plaintiff's costs of this suit, together with his attorneys' fees and prejudgment interest.

## XII. DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury.

Dated: White Plains, New York              BERNBACH LAW FIRM PLLC
        January 31, 2005

                                    By: s/Jeffrey M. Bernbach
                                        JEFFREY M. BERNBACH (JMB 5131)
                                        Attorneys for Plaintiff
                                        245 Main Street
                                        White Plains, NY  10601
                                        (914) 428-9100